# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

**A.P.G., INC.**

    **Vs.**   .                      **C.A. N0. 98-609ML**

**MCI TELECOMMUNICATIONS CORP.,**
**MCI COMMUNICATIONS CORP. and**
**CONSERV CORP.**

## JUDGMENT

[ ] *Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.*

[x] *Decision by the Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.*

*IT IS ORDERED AND ADJUDGED:*

Judgment shall enter for the defendants, MCI Telecommunications Corp. and MCI Communications Corp. against the plaintiff pursuant to the Memorandum and Order dated December 7, 2001 granting the defendants' Motion for Judgment as a Matter of Law. Defendant, Conserv Corp., is dismissed in accordance with the stipulation signed on December 27, 2001.

Enter:

*Barbara Barletta*
Deputy Clerk

DATED: December 28, 2001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

A.P.G., INC.

v.                                               C.A. No. 98-609ML

MCI TELECOMMUNICATIONS
CORP.; MCI COMMUNICATIONS
CORP.; and CONSERV CORP.


## MEMORANDUM AND ORDER

This matter is before the Court for written decision on the defendant's motion for
judgment as a matter of law.  The defendant lodged its motion at the close of the plaintiff's case-
in-chief on the issue of agency, in accordance with Fed. R. Civ. P. 50.  On Tuesday, November 6,
2001, the Court issued an oral decision on the record and informed counsel that a written
decision would follow.

## I. TRAVEL OF THE CASE

The parties came before the Court for trial in this matter on November 1, 2001.  The jury
heard the case over the course of three days.  On November 5, after A.P.G. had presented all
evidence relevant to the issue of agency, MCI's counsel moved for judgment as a matter of law
pursuant to Fed. R. Civ. P. 50.  In an oral decision issued on November 6, the Court granted that
motion.  This writing sets forth a detailed explanation of that ruling.

## II. STANDARD OF REVIEW

This Court may grant a motion for judgment as a matter of law if "the evidence, viewed
from the perspective most favorable to the nonmovant, is so one-sided that the movant is plainly

1

139

entitled to judgment, for reasonable minds could not differ as to the outcome." Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994), quoted in Criado v. IBM Corp., 145 F.3d 437, 441 (1st Cir. 1998).  In employing this standard, this Court does not "evaluate the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of evidence." Criado, 145 F.3d at 441 (internal quotation marks omitted).  Where a reasonable jury could reach only one conclusion on an issue, the court must grant judgment as a matter of law. Invest Almaz v. Temple Inland Forest Prods. Corp., 243 F.3d 26, 28 (1st Cir. 2001).  However, "[i]f 'fair minded' persons could draw different inferences, then the matter is for the jury." Transamerica Premier Ins. Co. v. Ober, 107 F.3d 925, 929 (1st Cir. 1997).

### III. EVIDENCE ADDUCED AT TRIAL

Prior to detailing the evidence presented at trial, it is helpful to briefly outline the issues in this case.  Plaintiff, A.P.G., Inc. ("A.P.G."), seeks damages it claims resulted from a breach of contract.  A.P.G. alleges that defendant, MCI Telecommunications Corporation ("MCI"), breached the Non-Circumvention/Non-Disclosure Agreement ("NC/ND Agreement") entered into by A.P.G. and Conserv Corporation ("Conserv"), one of MCI's distributors of prepaid phone cards.  MCI contends that Conserv was not its agent with respect to the contract between A.P.G. and Conserv and that Conserv had no authority to bind MCI to the NC/ND Agreement.  The threshold element of proof A.P.G. must establish is whether Conserv was in fact MCI's agent with the authority to bind MCI to the NC/ND Agreement.  Absent proof that Conserv had the authority (either actual or implied) to bind MCI to the agreement entered into by Conserv and A.P.G., there can be no finding of breach by MCI.  Based on the evidence adduced at trial, the Court determined that no reasonable jury could find that Conserv had the authority to bind MCI

2

to the NC/ND Agreement and granted defendant's motion for judgment as a matter of law.

A.    *MCI/Conserv Relationship*

Beginning in or about 1995, MCI began actively marketing its long distance telephone service through the sale of prepaid telephone cards. In marketing its prepaid phone cards, MCI used two main sales channels: 1) its Corporate National Accounts group solicited large business retailers directly, and 2) MCI entered into agreements with distributors who purchased MCI prepaid phone cards for resale. On or about April 24, 1996, MCI entered into an agreement with Conserv whereby Conserv was appointed a non-exclusive distributor to resell MCI prepaid phone cards ("MCI/Conserv Agreement"). Conserv agreed that MCI's right to compete with Conserv for MCI prepaid phone card business was not restricted. The agreement provides, in relevant part:

### 3.  DISTRIBUTOR APPOINTMENT

3.1    Distributor [Conserv] is hereby appointed as a non-exclusive agent for MCI prepaid distribution under the terms of this Agreement . . . Distributor specifically acknowledges and agrees that MCI may appoint other distributors and agents to market MCI PrePaid without any obligation or payment of compensation of any kind to Distributor.

. . . .

### 14.  RELATIONSHIP OF THE PARTIES

14.1    Except as expressly provided in this Agreement, the relationship of the parties hereto in the performance of this Agreement is that of independent contractors. Nothing contained in this Agreement will place the parties in the relationship of partners, joint venturers or employer-employee, and, except as set forth herein, neither party will have any right to obligate or bind the other in any manner whatsoever nor represent to third parties that it has any right to enter into any binding obligation on the other's behalf.

MCI prepaid phone card distributors were each assigned a prepaid agent manager who was responsible for attending sales calls with the distributor, assisting with their business and marketing plans, and helping to grow their overall business. Cindy Isaacs was the MCI representative responsible for servicing Conserv. Isaacs communicated with Conserv on almost a daily basis, and visited their offices in New Jersey monthly. In addition to providing support, Isaacs, in her role as an MCI distributor representative, had the authority to reject potential Conserv customers, was actively involved in customer solicitation, and reserved the right to tell Conserv to refrain from soliciting certain customers that MCI wished to pursue through its direct sales force.

B.    *Conserv/A.P.G. Relationship*

A.P.G. is a Florida corporation that was originally formed for the purpose of operating businesses not related to the telecommunications industry. In or around November 1996, Robert and Steven Rice, the president and vice-president of A.P.G. respectively, decided to pursue the business of selling prepaid phone cards. They began approaching various long distance carriers about the possibility of selling their prepaid phone cards. In late 1996, Steven Rice contacted MCI's general number and was referred to MCI employee Michelle Cayer.[1] Rice testified that he had two or three conversations with Cayer and that she referred Rice to Conserv, stating that Conserv could provide better rates on prepaid phone cards than MCI because, as a volume purchaser, Conserv was able to purchase phone cards at a substantial discount.

---

[1] The Court adopts that spelling of "Michelle Cayer" found in the Magistrate's Report and Recommendation dated December 1, 2000. Other documents in the record refer to "Michele Caher." The Court notes that there is only one MCI employee named Michelle who is relevant to this case.

4

In late 1996, Steven Rice contacted Conserv for the purpose of becoming a sub-distributor of Conserv's MCI prepaid phone cards. On January 16, 1997, A.P.G. and Conserv entered into the NC/ND Agreement, which is the subject of A.P.G.'s claim. The agreement provided that Conserv would pay A.P.G. commissions if Conserv entered into a contractual arrangement to sell to CVS Pharmacy, Inc. ("CVS") MCI's prepaid phone cards. Pursuant to this agreement, Conserv promised:

1.       . . . not to circumvent, avoid, or bypass A.P.G. either directly or indirectly, to avoid payment of fees or commissions or other benefits to A.P.G. financially or otherwise, by any cooperation, trust partnership or other in connection with their current agreement . . ..

2.       A. . . . not to disclose or otherwise reveal to any party any confidential information provided by the other and particularly that pertaining to the lenders, sellers, borrowers, buyers, and there names, addresses, telex, facsimile telephone numbers, or any other means of access thereto . . ..

Following the execution of this agreement, Steven Rice arranged a meeting between CVS and Conserv. The meeting took place at CVS's headquarters in Woonsocket, Rhode Island, on January 29, 1997. The purpose of the meeting was to make a sales presentation and discuss the possible sale of prepaid phone cards by Conserv to CVS ("Conserv proposal"). Steven Rice, Jim Vinci, a Conserv sales representative, Janice Jacobs, a CVS representative, and Cindy Isaacs attended the meeting. The parties disagree as to whether Isaacs knew of the existence of A.P.G., knew that Steven Rice was an A.P.G. representative, or knew that A.P.G. was a Conserv sub-distributor. According to Vinci, following that meeting, he continued to communicate with Isaacs and Steven Rice regarding the specifics of the Conserv proposal. In or about mid-March 1997, Jacobs communicated to Vinci that CVS's decision on purchasing prepaid phone cards was on hold, and that he would be notified when CVS decided to go forward. Jacobs contacted Vinci

5

in or about late April 1997 and told him that CVS was ready to go forward.

On May 16, 1997, Conserv and A.P.G. entered into a Sub-Distributorship/Agent Agreement ("SD/A Agreement") whereby A.P.G. agreed to provide the name and address of CVS to Conserv. In return, Conserv agreed that if it entered into an agreement with CVS for the purchase of prepaid phone cards, Conserv would pay A.P.G. a specified commission depending on the profitability of the deal. Prior to the SD/A Agreement being executed, drafts of that agreement were sent back and forth between Conserv and A.P.G. Specifically, on or about April 3, 1997, Conserv forwarded a proposed SD/A Agreement to A.P.G. In that correspondence, Conserv acknowledged that A.P.G. had introduced Conserv to CVS but expressly provided: "It is clearly agreed and understood that Conserv has no control over the actions of MCI National Accounts, MCI Branch offices, and/or any other entity not in Conserv's direct control." Following the April 3, 1997, draft, a revised SD/A Agreement was drafted and forwarded by A.P.G. to Conserv on May 7, 1997. That draft contained similar language to that contained in the April 3rd draft: "[N]othing in this Agreement shall be interpreted as to give Conserv or Conserv's Agents rights to restrict MCI, its direct employees, agents or any other entities under MCI's influence to operate within any such 'exclusive areas.'" Subsequent to the May 16, 1997, execution of the final draft of the SD/A Agreement, in or about early June 1997, Conserv and A.P.G. learned that CVS was dealing directly with MCI.

C.   *MCI/CVS Agreement*

In late April 1997, Janice Jacobs contacted Jim Vinci for further bid information. Vinci then relayed Jacob's questions to Cindy Isaacs. Following this communication, Isaacs informed Mary McGann, the head of MCI's Corporate National Accounts group, that CVS was seeking bid

information.  In or about mid-May 1997, James Richards, an MCI Corporate National Accounts

group sales representative, spoke with Jacobs regarding MCI prepaid phone cards.  Soon

thereafter, Richards delivered a proposal to Jacobs at CVS headquarters in Woonsocket, Rhode

Island.  In either May or June of 1997 that proposal was accepted by CVS ("MCI/CVS

Agreement").

   D.   *MCI/A.P.G. Contacts*

      Steven Rice testified that the only contact he had with anyone from MCI, prior to the

MCI/CVS Agreement being entered into, was his phone calls to MCI requesting prepaid phone

card information, and his contact with Cindy Isaacs at the January 29, 1997, CVS meeting.

Besides Michelle Cayer, neither Robert[2] nor Steven Rice, nor anyone else at A.P.G., spoke with

anyone from MCI prior to entering into the NC/ND Agreement.  That agreement was never

submitted to MCI. Further, A.P.G. concedes that no one reviewed the Conserv/MCI Agreement

on its behalf prior to entering into the NC/ND Agreement with Conserv.

## IV. DISCUSSION

      In its oral decision of November 6, this Court determined that Conserv did not have the

authority to bind MCI to the NC/ND Agreement.  The discussion that follows provides a

thorough explanation of that determination.

      This Court was confronted with the question of whether an agency relationship existed

between MCI and Conserv, and, if so, whether the scope of that relationship authorized Conserv

---

[2]Robert Rice testified that, while on the beach in Florida, he was introduced to an MCI
employee who was an acquaintance of one of his friends.  This meeting occurred prior to the
execution of the NC/ND Agreement; however, the employee did not work for MCI's prepaid
phone card division, did not make any representations regarding prepaid phone card distribution,
and merely spoke to Robert about his interest in the prepaid phone card business.

to bind MCI to the NC/ND Agreement.[3]

## I. *Agency*

Under Rhode Island law, agency may be based on either actual authority or apparent authority. Commercial Assoc. v. Tilcon Gamino, Inc., 998 F.2d 1092, 1099 (1st Cir. 1993) (citing Menard & Co. Masonry Bldg. Contractors v. Marshall Building Sys., Inc., et al., 539 A.2d 523, 527 (R.I. 1988)). Actual authority "requires evidence of an actual understanding between the principal and agent that the latter is to act on behalf of the former." Id. In contrast, apparent authority "arises from the principal's manifestation of such authority to the party with whom the agent contracts." Menard & Co., 539 A.2d at 526 (citing 1 Restatement (Second) Agency § 8 (1958)). "In other words, the focus is on the conduct of the principal, not the putative agent." Commercial Assoc., 998 F.2d at 1099. The principal must act in a way that leads a third party to believe that the agent is authorized to act on the principal's behalf. See id. Additionally, "the third party's belief in the agent's authority to act on behalf of the principal must be a reasonable one." Id. (citing Rodrigues v. Miriam Hosp., 623 A.2d 456 (R.I. 1993); Restatement (Second) of Agency § 267).

## II. *Scope of the Agency*

Generally, "'the existence and scope of an agency relationship is . . . a factual determination,' and within the province of the jury." Calenda v. Allstate Ins. Co., 518 A.2d 624, 628 (R.I. 1986) (quoting Petrone v. Davis, 373 A.2d 485, 487 (R.I. 1977) (citation omitted)). However, where the record offers no legally sufficient evidentiary basis for plaintiff's allegations

---

[3] The thrust of Plaintiff's argument is that because Conserv was an agent of MCI for the purpose of selling prepaid phone cards it was authorized to enter into all agreements which were incidental to that arrangement: i.e., the NC/ND Agreement.

concerning the existence or scope of an agency relationship, the Court is not precluded from granting a motion for judgment as a matter of law with respect to that issue. See Fed. R. Civ. P. 50. In evaluating the extent of the agency, the Court will look to the record to determine what authority has been vested in the agent by the principal. Compare AAA Pool Serv. & Supply, Inc. v. Aetna Cas. & Sur. Co., 479 A.2d 112, 115 (R.I. 1984) (stating that a "review of the record, with regard to the question of agency . . . discloses [that insurance agent] was a party to an agency agreement [and] [u]nder the terms of that agreement, [the agent] was authorized not only to 'solicit proposals' but also 'to bind and execute contracts' for insurance"), with daSilva v. Equitable Fire & Marine Ins. Co., 263 A.2d 100, 102 (R.I. 1970) (stating that insurance agent "on this record was empowered only to accept or solicit applications for insurance" and did not have the authority to bind the principal). The focus of the inquiry is on the *specific act* which the plaintiff contends should be attributed to the principal, in this case Conserv's entry into the NC/ND Agreement with A.P.G. See Calenda, 518 A.2d at 628 (quoting Soar v. National Football League Players Assoc., 438 F. Supp. 337, 342 (D.R.I. 1975), aff'd, 550 F.2d 1287 (1st Cir. 1977)) (stating that the focus of the inquiry into an agent's authority is on the specific act which the plaintiff claims must bind the principal).

An agency relationship, much like the duty of care owed by one individual to another, has a cut-off point, beyond which no liability will be imposed. See, e.g., AAA Pool Serv., 479 A.2d at 115; Brimbau v. Ausdale Equip. Rental Corp., 376 A.2d 1058, 1064 (R.I. 1977). In tort, one's duty to another is cut off by "foreseeability." See Carrier v. Riddell, Inc., 721 F.2d 867, 868 (1st Cir. 1983) (citing Palsgraf v. Long Island R.R. Co., 162 N.E. 99, 99-100 (N.Y. 1928)). Similarly, a principal will not be liable for actions taken by his agent that are not within the scope

9

of the agency, i.e., not authorized, contemplated, or subject to the control of the principal.  Here, A.P.G. relies on the existence of the Conserv/MCI distributor agreement and avers that all agreements incidental to that arrangement are imputed to MCI.  The relevant inquiry, however, is much narrower.  Certainly, a case could be made that Conserv was MCI's agent with respect to the sale by Conserv of MCI prepaid phone cards to its sub-distributors.  However, A.P.G.'s claim here relates to a separate agreement between it and Conserv wherein A.P.G.'s interests are protected in its providing a potential sales contact to Conserv.  Thus, the Court must look to the facts which establish Conserv's authority to bind MCI to that agreement, and then determine whether the record evidence is sufficient to submit the agency question to the jury.

A.    *Actual Authority*

Under Rhode Island law the plaintiff must prove three elements to show that an agency relationship exists:

> 1) the principal must manifest that the agent will act for him;
>
> 2) the agent must accept the undertaking; and
>
> 3) the parties must agree that the principal will be in control of the undertaking.

Rosati v. Kuzman, 660 A.2d 263, 265 (R.I. 1995).  The essence of an agency relationship is the principal's right to control the work of the agent, whose actions must primarily benefit the principal.  See Lawrence v. Anheuser-Busch, Inc., 523 A.2d 864, 867 (R.I. 1987).  An independent contractor, on the other hand, "is retained to perform a task independent of and not subject to the control of the employer."  Toledo v. Van Waters & Rogers, Inc., et al., 92 F. Supp. 2d 44, 53 (D.R.I. 2000).

Thus, to establish that Conserv had "actual authority" to bind MCI to the NC/ND

10

Agreement Conserv entered into with A.P.G., A.P.G. must establish the following three
elements:

> 1) that MCI manifested or indicated that Conserv had the authority to act on
> MCI's behalf and bind MCI to the NC/ND Agreement;

> 2) that Conserv accepted this arrangement; and

> 3) that there was an agreement between Conserv and MCI that MCI would have
> the right to control Conserv under this arrangement.

1. *First Element - Conserv's Authority to Bind MCI*

The Court's inquiry begins with an analysis of the facts supporting the first element of the

agency test: whether MCI manifested that Conserv had the authority to bind MCI to the NC/ND

Agreement.  The only evidence that has been submitted concerning the MCI/Conserv

relationship is the MCI/Conserv Agreement.  That agreement states that "neither party will have

any right to obligate or bind the other in any manner whatsoever nor represent to third parties that

it has any right to enter into any binding obligation on the other's behalf."  MCI/Conserv

Agreement, ¶ 14.1.  Pursuant to this agreement, Conserv is classified as a "non-exclusive"

distributor for MCI.  MCI/Conserv Agreement, ¶ 3.1.  Conserv was authorized to sell MCI

prepaid phone cards, but understood that such sales would be subject to competition from any

one of a number of other MCI distributors with the same rights, as well as from MCI itself.

Thus, Conserv did not have authority to bind MCI to a non-circumvention agreement with a third

party because the MCI/Conserve Agreement specifically allowed MCI to circumvent its

distributors, i.e., compete with its distributors for phone card business either directly or through

other non-exclusive distributors.  A.P.G.'s contention that Conserv was MCI's agent with the

authority to bind MCI to the NC/ND Agreement between Conserv and A.P.G., is a legal

11

impossibility in light of the non-exclusivity of the MCI/Conserv Agreement. Simply put, Conserv could convey no more rights than it had under its agreement with MCI. Thus, since Conserv could not reserve a right to commissions if select customers happened to sign on with MCI in the future, it could not bind MCI to a similar agreement with a third party. The extent of Conserv's authority is fully defined in the MCI/Conserv Agreement, which makes it clear that MCI did not manifest to Conserv that Conserv had the authority to enter into the NC/ND Agreement on MCI's behalf. More importantly, A.P.G. has failed to provide *any* evidence which refutes the plain language of the MCI/Conserv Agreement.

For A.P.G. to prevail at this stage of the litigation, sufficient evidence on each element of the test for agency must be available for the jury to evaluate; nonetheless, the Court will address the remaining two prongs of the test on the merits.

2. *Second Element - Conserv's Acceptance of the Arrangement*

Similarly, A.P.G. has presented no evidence that Conserv believed that it had the authority to bind MCI to agreements between Conserv and third parties. The only evidence submitted concerning Conserv's understanding of its relationship with MCI was the MCI/Conserv Agreement, which was executed by Conserv and, as discussed above, clearly indicates that Conserv did not have the authority to bind MCI to the NC/ND Agreement. The only testimony from a Conserv employee came from Jim Vinci, a Conserv salesman who had no part in negotiating the MCI/Conserv Agreement, never saw the agreement, and offered no insight into whether Conserv believed MCI was bound to the NC/ND Agreement or whether Conserv had the authority to bind MCI. In fact, Vinci testified that the existence of a non-circumvention agreement was not something that would have normally been discussed with Cindy Isaacs.

Therefore, the Court finds that the second element of the agency test has not been satisfied.

    3. *Third Element - MCI's Control of Conserv Side Agreements*

      At trial, A.P.G. focused on MCI's right to control Conserv's activities as they related to the sale of prepaid phone cards. However, as previously discussed, A.P.G.'s claim does not relate to the sale of MCI prepaid phone cards by Conserv; rather, A.P.G. claims that MCI breached a promise made by Conserv not to circumvent A.P.G. in the event Conserv entered into a contract to sell phone cards to CVS. Thus, the Court's analysis must focus on whether MCI exercised any control over that agreement. MCI could reject a Conserv sub-distributor if MCI believed the customer was a credit risk; MCI exercised control over how its phone cards were marketed; and MCI reserved the right to tell its distributors to refrain from soliciting certain customers it wished to pursue directly. However, A.P.G. has presented no evidence that MCI exercised general control over the terms, conditions, or circumstances of agreements Conserv entered into with third parties; more specifically, there is *no* evidence that MCI exerted *any* control over Conserv's side agreements with its sub-distributors.

      A.P.G.'s reliance on Butler v. McDonald's Corp. is inapposite. 110 F. Supp. 2d 62 (D.R.I. 2000). In that case, a negligence action was brought against a restaurant franchisor on behalf of a child who was injured by a glass door in a franchised restaurant which shattered when he pushed against it to enter the restaurant. The plaintiff sought to hold the defendant franchisor vicariously liable for the negligence of its franchisee based on the doctrine of agency. The Butler Court found that summary judgment was inappropriate where the plaintiff conducted "frequent and detailed inspections of the premises and its operations, the taking of profits, and the right of defendant to terminate the agreement for material breach." Id. at 67. The focus in Butler, as is

13

the case in any agency analysis, is whether the principal exercised any control over the offending instrumentality: in that case, the restaurant premises and the agreement governing the operation of those premises.  Here, it is clear that MCI did not exercise any control over Conserv's side agreements with its sub-distributors.  In fact, the NC/ND Agreement was not even drafted by Conserv, it was drafted by A.P.G.  Additionally, there is no evidence that MCI ever even saw the agreement, knew of its existence, or knew that Conserv was entering into agreements of that nature, let alone that MCI exercised control over the Agreement's content, terms, or conditions.  More importantly, A.P.G. has not presented any evidence that MCI exerted any control over Conserv's side agreements with its sub-distributors.

Therefore, because A.P.G. has failed to produce any evidence indicating that Conserv was MCI's agent with the authority to bind MCI to the NC/ND Agreement, MCI is entitled to judgment as a matter of law on this theory of agency.

B.    *Apparent Authority*

As an alternate theory, A.P.G. contends that Conserv had the "apparent authority" to enter into the NC/ND Agreement on MCI's behalf.  "An agent's apparent authority to contract on behalf of his principal arises from the principal's manifestation of such authority to the party with whom the agent contracts."  Menard & Co., 539 A.2d at 526 (citing 1 Restatement (Second) Agency § 8).  The principal must act in a way that leads a third party to believe that the agent is authorized to act on the principal's behalf.  Commercial Assoc., 998 F.2d at 1099.  In addition, "[t]he third person with whom the agent contracts must believe that the agent has the authority to bind its principal to the contract," Menard & Co., 539 A.2d at 526 (citing 1 Restatement (Second) Agency § 8, comment a at 30-31), and such belief must be reasonable.  See American

14

Title Ins. Co. v. East West Fin., 16 F.3d 449, 454 (1st Cir. 1994) (quoting Calenda, 518 A.2d at

628); see also id. (citing Sheldon v. First Federal Savings & Loan Ass'n, 566 F.2d 805, 809 (1st

Cir. 1977) (stating that third party must exercise due care before relying on agent's apparent

authority)).

The only direct contacts between MCI and A.P.G. prior to the execution of the NC/ND

Agreement were the two or three phone conversations between Steven Rice and Michelle Cayer,

which Rice initiated.  The substance of those conversations consisted of Cayer telling Rice that

he should contact Conserv because he could get better pricing from Conserv.  Other than these

phone conversations, there were no other communications between A.P.G. and MCI prior to the

execution of the NC/ND Agreement.

As discussed above, the NC/ND Agreement was drafted by A.P.G. and ultimately

accepted by Conserv.  The only mention of MCI in the NC/ND Agreement is the reference to the

MCI prepaid phone card as the product to be sold under the agreement.  Additionally, no one at

A.P.G. ever saw or asked to see the MCI/Conserv Agreement.  Nor did anyone at A.P.G. ask

Conserv to describe its relationship with MCI.  In fact, the only evidence on the record

concerning A.P.G.'s knowledge of the MCI/Conserv relationship is found in the drafts of the

SD/A Agreement, the executed copy of that agreement, and the letter Steven Rice sent to

Cumberland Farms concerning an outstanding sales proposal; all of which were drafted after the

execution of the NC/ND Agreement.  These documents indicate that A.P.G. knew that Conserv

did not have the authority to act for MCI, that Conserv and A.P.G. did not have any control over

the actions of MCI, and that A.P.G. was aware that MCI competed directly with its distributors.

In short, there is absolutely no evidence which suggests that MCI caused, either directly

or indirectly, A.P.G. to believe that Conserv had the authority to enter into the NC/ND Agreement on MCI's behalf.  Further, there is nothing to suggest that A.P.G. reasonably believed that Conserv was authorized to bind MCI.  For A.P.G. to establish that Conserv had the apparent authority to act on MCI's behalf, it must show that MCI manifested to A.P.G., either directly or indirectly, that Conserv had the authority to act on its behalf, and that A.P.G. reasonably believed that this authority existed.  The record is devoid of any evidentiary support for either of these propositions.  This complete lack of any evidence which would suggest that Conserv had the apparent authority to act on MCI's behalf does not warrant submission of the case to the jury on this theory.

<u>V. CONCLUSION</u>

For the reasons outlined herein, the Court granted the defendant's motion for judgment as a matter of law.

SO ORDERED.

Mary M. Lisi
United States District Judge
December  7  , 2001

16