# United States Court of Appeals
## For the First Circuit

FILED
FEB 10 2006
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

No. 02-1120

APG, INC.,

Plaintiff, Appellant,

v.

MCI TELECOMMUNICATIONS CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Howard, Circuit Judge.

Howard B. Klein, with whom Mark B. Decof and Decof & Decof, P.C., were on brief, for appellant.

Mark A. Berthiaume, with whom Louis J. Scerra, Jr., Marc DeSisto, Schnader Harrison Goldstein & Manello, and DeSisto Law were on brief, for appellee.

February 8, 2006

**COFFIN, Senior Circuit Judge**. In early 1997, appellant APG, Inc., acting as a middleman, initiated discussions with CVS Corp. ("CVS"), the national drug store chain, in an effort to persuade CVS to buy, for re-sale in its stores, prepaid telephone cards provided by MCI Telecommunications Corp. ("MCI"). Ultimately, CVS and MCI bypassed APG; CVS contracted directly with MCI to buy thousands of prepaid cards annually. In this diversity action, APG claims that MCI deceitfully closed the deal on its own at the last minute, taking advantage of APG's efforts and unfairly depriving the small company of commissions. APG's complaint sought damages on both tort and contract theories. The district court granted summary judgment in favor of MCI on the tort claims and later granted judgment as a matter of law on the contract claim. Asked to review each of those dispositions, we have carefully examined the record and relevant law. Although we agree that the district court properly dismissed most of the claims, we conclude that the facts of record thus far, viewed in appellant's favor, leave open the possibility of liability on a theory of unjust enrichment. We therefore remand for further proceedings on that issue.

## I. Factual Background

We draw the facts from the depositions and other materials contained in the summary judgment record, as well as from the testimony adduced during the trial on the contract claim, and recount them in the light most favorable to appellant. See Burton

v. Town of Littleton, 426 F.3d 9, 14 (1st Cir. 2005); González-Piña v. Rodríguez, 407 F.3d 425, 431 (1st Cir. 2005).[1]

Appellant APG is a small family business that was incorporated in the mid-1990s by Jordan Rice, a resident of Florida. The company was involved primarily in the sale of automobiles before Rice's son, Steven, joined the company as vice president in late 1996 and decided to explore adding the sale of prepaid telephone cards to the company's other activities. He was referred by an MCI representative to Conserv Corp. ("Conserv"), one of a number of third-party distributors that purchased MCI prepaid cards for re-sale. Typically in MCI's prepaid sales department, such independent distributors pursue sales to smaller businesses, while larger potential accounts - the "top 200" or so companies - are handled directly by MCI's own sales staff. On occasion, when a distributor has special access to one of the large companies through a personal contact, MCI will pursue that account through the distributor.

Steven Rice and his brother, Robert, APG's president, had just such a connection to offer Conserv: their mother, Janice, was an old friend of CVS's president and CEO, Stanley Goldstein. Steven Rice proposed that APG serve as a sub-distributor or sub-agent of

---

[1] Our review of the summary judgment rulings is limited to the record as it stood at the time of the district court's decision, see J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1250 (1st Cir. 1996), and we accordingly have relied only on such materials in considering the tort claims.

Conserv for the sale of MCI prepaid cards, with commissions to be paid when Rice linked Conserv with his "retail contacts." APG and Conserv subsequently entered into a "Non-Circumvention/Non-Disclosure Sales Agreement" specifically with respect to the sale of prepaid telephone cards to CVS. Dated January 16, 1997, the agreement provided that Conserv would not "circumvent, avoid, or bypass APG either directly or indirectly, to avoid payment of fees or commissions or other benefits to APG . . . ."

About a week after the two companies signed the agreement, Steven Rice spoke with the CVS buyer responsible for prepaid cards, Janice Jacobs, and scheduled a meeting at CVS headquarters to discuss CVS's possible purchase of MCI prepaid cards. An assistant to Goldstein had called Jacobs and requested that she speak with Rice about the telephone cards following a phone conversation between Janice Rice and her old friend. In attendance at the meeting, which took place on January 29, were Jacobs, Rice, Conserv's vice president Jim Vinci, and Cindy Isaacs, an MCI prepaid agent manager. As an agent manager, Isaac, an MCI employee, helped her assigned distributors sell MCI prepaid cards, and Vinci had asked her to attend the meeting to support Conserv and APG.

Rice and Vinci had prepared a written proposal for CVS using a "Power Point" format that MCI had provided and, at the meeting, Isaacs made a presentation about MCI prepaid cards that included

assurances that Conserv could meet CVS's needs, supported by MCI and its technical staff. A number of follow-up conversations took place, including one in which Robert Rice assured Jacobs that "dealing with us at Conserv was like dealing with MCI directly."

In March, Jacobs sent Vinci a letter stating that CVS was putting the prepaid program on hold until mid-August and that she would contact him again when the program became active. In a phone conversation with Vinci, Jacobs attributed the delay to CVS's pending merger with Revco. In late April, however, Jacobs called Vinci to request additional information about Conserv's bid. Her call triggered a flurry of activity: Vinci called Isaacs to obtain answers to some of the questions Jacobs had raised; Vinci notified APG of the renewed contact; and, after Vinci's call to her, Isaacs sent an email to Mary McGann, MCI's in-house sales manager, to give her "a heads-up" about CVS's apparently imminent plan to choose a prepaid provider. The email reported that Jacobs had identified four companies "in the running for the deal," including Conserv, and Isaacs noted that none was a major carrier. The email also detailed the information that CVS was seeking from Conserv.

Isaacs' email is pivotal to appellant's claims in this case. APG maintains that it was this email that put MCI's direct sales division on notice of CVS's impending purchase of prepaid cards and prompted that division to step in and appropriate the sales opportunity developed by Conserv and APG. Although the immediacy

of CVS's intent to choose a provider apparently was news to MCI, the record shows that, prior to Isaacs' email, MCI's direct sales team had taken steps toward marketing prepaid cards to CVS, which already was a high-volume customer of MCI's regular long-distance service. The record contains a draft of a letter from an MCI national accounts manager, dated March 24, 1997, and a series of emails among MCI executives dated April 7 and 8, which contain references to the marketing of prepaid services to CVS. In another series of emails sent on April 21 - four days before Isaacs' email - McGann and others involved with direct sales made comments that indicated that MCI was moving ahead with a direct pursuit of CVS's prepaid business. Indeed, in her reply to Isaacs, McGann noted that "[w]e have had high level meetings with this account," including a dinner meeting "the other night" with a merchandising executive, and she observed that "Janice [Jacobs] seems to be going down a different path." Isaacs herself had referred in her email to the direct sales department's relationship with CVS, stating that "I know that CVS is on your list."

Despite this internal discussion about MCI's direct interest, Isaacs continued to support Conserv's efforts to secure the account, and it appears that neither Conserv nor APG was aware of any separate dealings by MCI to make a direct sale. A few days after Vinci's phone conversation with Jacobs, he sent a letter answering her questions and offering marketing funds and

promotional materials that, in relevant part, Isaacs had approved. In mid-May, in response to Jacobs' inquiry about a test program for prepaid cards, Steven Rice sent a letter outlining the specifics of such a program - again offered with Isaacs' approval. On May 16, APG and Conserv entered into a second contract - a "Sub-Distributor/Agent Agreement" - in which APG was to receive a specified commission for each "unit" of prepaid calling time purchased by CVS.

The exchange of inquiries and information between Conserv/APG and CVS was not the only indicator that CVS was becoming increasingly focused on the Conserv proposal. Both Rice brothers had conversations in mid-May with Helena Foulkes, CVS's vice president and merchandising manager, who told them that Conserv was one of two or three companies under consideration.

Meanwhile, MCI's direct sales team was jumping into the competition with both feet. Ray Richards, an in-house MCI prepaid account executive, spoke with Jacobs on May 14 and was told that, if MCI wanted to be involved directly, CVS must have a proposal to review by Friday, May 16.[2] In an email message to McGann, his

---

[2] Richards testified in his deposition that Jacobs had called him a day earlier and left a voice message with a number of questions about MCI's prepaid cards. He had had no prior contact with her. Although an MCI vice president, Jeffrey Lindauer, testified that he had received a request for a written proposal from Foulkes during an April 23 telephone conference, we found no evidence in the record of any steps taken to fulfill such a request before Richards took action after his conversation with Jacobs.

supervisor, after the phone conversation with Jacobs, Richards reported that Jacobs had asked if CVS would receive the same support from MCI if the business came through a distributor. In his deposition, Richards acknowledged telling Jacobs that "CVS would be better served if they were to deal directly with MCI" because of the technical complexity of the program.

Richards spent two days preparing a proposal, which he cleared with McGann and then hand-delivered on Friday, May 16. He met with Jacobs and Foulkes that day, submitted a revised proposal by fax on the following Monday, and continued discussions through the week. Jacobs called Richards to verbally accept the MCI proposal a week or two later. MCI and CVS entered into a written agreement on September 2 providing for the sale of MCI prepaid cards in CVS stores. After the Rices unsuccessfully asserted their right to receive commissions on the CVS deal through various communications with MCI and CVS executives, APG filed this action claiming tort and contract damages - asserting, in essence, that MCI had unfairly appropriated the CVS business opportunity.

## II. Procedural Background

APG's amended complaint, filed in March 1999, alleged five causes of action against MCI: (1) tortious interference with its contract with Conserv; (2) tortious interference with its business expectancy with CVS; (3) quasi-contract/unjust enrichment; (4) breach of contract, specifically breach of the Non-

Circumvention/Non-Disclosure Agreement; and (5) unlawful misappropriation.[3]

The district court, adopting the recommended decision of the magistrate judge, granted summary judgment for MCI on all but the contract claim. In the magistrate judge's view, plaintiff's case suffered from two primary flaws: MCI's conduct constituted legitimate competitive behavior, and the evidence in any event failed to establish the necessary element of causation because there was insufficient proof that CVS would have selected the Conserv/APG proposal but for MCI's intervention. On the contract claim, the magistrate judge identified a factual dispute as to whether Conserv acted as MCI's agent in executing the Non-Circumvention/Non-Disclosure Agreement with APG, but after APG presented its case at trial, the district court concluded that there was no basis on which a jury could find that Conserv had authority to bind MCI. Thus, on the fourth day of trial, the court granted judgment as a matter of law for MCI.

On appeal, APG challenges the district court's rulings on each of its claims.[4] We employ de novo review for both the grant of

---

[3] Conserv and MCI's parent corporation, MCI Communications Corp., were originally named as additional defendants but were dismissed from the case by stipulation. APG originally had obtained a default judgment against Conserv but dropped the claims against it because the company was defunct.

[4] Appellant also challenges the district court's ruling that it could not seek disgorgement of profits under the breach of contract claim. Our disposition makes it unnecessary to address

summary judgment and the district court's grant of judgment as a matter of law at trial on the contract claim. Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 329-30 (1st Cir. 2005) (summary judgment); Burton, 426 F.3d at 14 (judgment as a matter of law at trial). In assessing the facts, we take "all inferences in favor of [appellant], and ask whether a reasonable jury could have found defendant[] liable based on the evidence presented." Burton, 426 F.3d at 14; see also González-Piña, 407 F.3d at 431. We are not confined to the district court's reasoning, but may affirm its decision on any sufficient ground supported by the record. Colburn, 429 F.3d at 330; Invest Almaz v. Temple-Inland Forest Prods., 243 F.3d 57, 75 (1st Cir. 2001).[5]

## III. Discussion

### A. Breach of Contract

APG alleges that Conserv acted as MCI's agent in executing the Non-Disclosure/Non-Circumvention Agreement, thereby binding MCI to the agreement, and that MCI's direct solicitation of the CVS prepaid business constituted a breach of that contract. APG relies primarily on the concept of "incidental authority" to support its

---

that issue.

[5] We note that APG has asserted that New Jersey law, rather than Rhode Island law, should be applied in this case in instances where the two jurisdictions would diverge. That argument is undeveloped on appeal, and we consequently deem it waived. See Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 n.12 (1st Cir. 2005); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

claim, arguing that Conserv had the authority to take any steps on behalf of MCI that were necessary to fulfill its role as an MCI prepaid distributor. See Restatement (Second) of Agency § 35 (1958) ("authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it"); id. at § 50 ("authority to make a contract is inferred from authority to conduct a transaction, if the making of such a contract is incidental to the transaction, usually accompanies such a transaction, or is reasonably necessary to accomplish it").

We agree with the district court that the evidence would not permit a jury to find that Conserv acted as MCI's agent in signing the Non-Disclosure/Non-Circumvention Agreement. Although the contract establishing Conserv's distributor relationship with MCI referred to Conserv in its preamble as a "sales agent" and elsewhere referred to Conserv as a "non-exclusive agent for MCI PrePaid," these labels are for several reasons insufficient - in light of the other evidence - to create agency authority for a contract negating MCI's right to compete directly in the sale of its prepaid cards.

First, when the MCI-Conserv agreement explicitly addressed the parties' relationship, it defined Conserv's role to be that of an independent contractor, and it stated that neither party could bind

the other.[6] Whether or not MCI could in that manner disclaim responsibility for contracts signed by Conserv relating to MCI's prepaid service, we agree with the district court that the disclaimer at least suffices to eliminate authority beyond such actions. In our view, this is what the Restatement anticipates with respect to "incidental authority." MCI might be bound, for example, if Conserv promised a customer 24-hour, on-site help in activating calling cards because such a promise relates directly to the product that Conserv is distributing pursuant to its contract with MCI. By contrast, a non-compete agreement with a sub-distributor is unrelated to either the MCI product or the sales transaction with the customer.

Second, this limited scope for the agency relationship is supported by Conserv's non-exclusive status as a distributor for MCI's prepaid service; in effect, MCI was explicitly authorized to generate competition for Conserv by soliciting other distributors. Although the district court was of the opinion that the words "non exclusive agent" in MCI's contract with Conserv "specifically allowed MCI to [directly] circumvent its distributor[]," we need not accept the interpretation that MCI's direct competition was expressly allowed to reject the argument that MCI was contractually

[6] Paragraph 14.1 of the Agreement states: "[E]xcept as set forth herein, neither party will have any right to obligate or bind the other in any manner whatsoever nor represent to third parties that it has any right to enter into any binding obligation on the other's behalf."

barred from competing with Conserv and APG. Because the Conserv-MCI contract did not protect Conserv (and, by extension, APG) from third-party competition initiated by MCI, finding any kind of limitation on MCI's competitive activity in the Non-Disclosure/Non-Circumvention Agreement between Conserv and APG would be a stretch that a jury could not reasonably make without other evidentiary support.

And, indeed, yet another bit of evidence is to the contrary – and negates the possibility that APG was deceived by Conserv's "apparent authority" to act on MCI's behalf. See generally Commercial Assocs. v. Tilcon Gammino Inc., 998 F.2d 1092, 1099 (1st Cir. 1993) (noting that an agent may bind a principal to a contract pursuant to actual or apparent authority). Preliminary drafts of the "Sub-Distributor/Agent Agreement" that was signed by Conserv and APG in May 1997 reiterated the "non-circumvention/non-disclosure" promise from their earlier agreement but also included a statement that Conserv had "no control over the actions of MCI National Account, MCI Branch offices and or any other entity not in Conserv's direct control." Although this declaration did not appear in the version that ultimately was signed by both parties and dated May 16, it is significant that Steven Rice on May 7 did sign a draft, dated April 3, that contained the provision – suggesting that he understood and accepted that that promise did not extend to MCI.

In sum, we can find no support in the record for a jury finding that MCI contractually obliged itself not to compete with Conserv and APG for the CVS business. Whether or not MCI's conduct was fair is another matter, and a subject we address with respect to the tort claims. On the contract claim, however, we affirm the district court's grant of judgment as a matter of law for MCI.

B. Tort Claims

Appellant's tort claims - tortious interference (Counts I and II), unjust enrichment (Count III), and misappropriation of trade secrets (Count V)[7] - all rest on essentially the same factual foundation. APG alleges that after it (with Conserv) brought CVS to the brink of finalizing a prepaid card deal, MCI stepped in at the last minute and knowingly took advantage of the distributors' months of work. APG asserts that this conduct interfered with both its contractual agreement with Conserv for commissions on the CVS deal and its expected business relationship with CVS - and, in the process, unjustly enriched MCI. The trade secrets claim is based on Isaacs' April 25 email disclosing information about CVS's needs, its interest in MCI's product, and the imminence of its decision - i.e., the information allegedly used by MCI to tortiously divert the business to itself.

---

[7] The misappropriation claim originally was framed more broadly to include alleged misappropriation of APG's potential customer, CVS, but that aspect of the claim has been dropped.

APG's position is not without force. The record would allow a jury to find that the small company used its connection to get in the door at CVS, spent several months in regular contact with the prepaid card decision-makers, became one of the top contenders for the business, started making preparations for a test program - all with the support of MCI as represented by Isaacs - and then was displaced at the eleventh hour after Isaacs alerted the in-house sales people that CVS was ready to close a deal, passing along information she obtained only because of her supposedly collaborative relationship with Conserv. Although - unbeknownst to APG[8] - MCI's direct sales staff also was targeting CVS, they apparently failed to aggressively pursue the business opportunity until alerted by Isaacs that it was almost gone. Moreover, when questioned about the relative merits of purchasing from MCI or a distributor like Conserv, MCI - represented by Ray Richards - undermined Conserv's efforts by telling CVS that it would get better service with a direct sale.

We agree with APG that this scenario presents a strong impression of unfair treatment; it is not enough, however, for APG to reach a jury on three of its four tort theories. We explain our conclusions below with respect to each of the tort counts.

---

[8] We note that the record does contain evidence that MCI's direct pursuit of CVS was disclosed. Isaacs and her supervisor, James Lenhart, testified in depositions that they recalled instructing Conserv to back out of the process with CVS because there was a pre-existing direct relationship with MCI.

1. Tortious interference. The elements of a claim for tortious interference with contractual relations under Rhode Island law are: (1) the existence of a contract; (2) defendants' knowledge of the contract; (3) defendants' intentional interference with the contract; (4) damages caused by the interference. Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I., 883 F.2d 1101, 1113 (1st Cir. 1989); Ed Peters Jewelry Co. v. C & J Jewelry Co., 51 F. Supp. 2d 81, 101 (D.R.I. 1999), aff'd, 215 F.3d 182 (1st Cir. 2000); Western Mass. Blasting Corp. v. Metro. Prop. and Cas. Ins. Co., 783 A.2d 398, 401 (R.I. 2001); Jolicoeur Furn. Co. v. Baldelli, 653 A.2d 740, 752 (R.I. 1995). The same elements are required to state a claim based on tortious interference with a prospective contractual relationship, with the exception that the defendant's knowledge must relate to a business relationship or expectancy, rather than to an actual contract. Mesolella v. City of Providence, 508 A.2d 661, 669-70 (R.I. 1986).

The magistrate judge, whose 28-page opinion thoroughly detailed the facts and relevant law, concluded that appellant could not establish elements three and four for either claim.[9] The evidence on interference fell short, he ruled, because such interference must be "unjustified," see Ed Peters Jewelry Co., 51

[9] The court found that the first two elements of the contractual interference claim were met for summary judgment purposes, but that the evidence was insufficient to meet any of the requirements for the claim alleging interference with a prospective business relationship.

F. Supp. 2d at 102, and MCI's conduct was simply normal competitive activity. He concluded that appellant also lacked evidence sufficient to show that "but for MCI's alleged misdeeds, CVS would have chosen Conserv as its prepaid phone card provider." Opinion at 20 (emphasis in original).

We part company with the magistrate judge on the issue of interference,[10] concluding that the record would have permitted the jury to find that MCI's conduct amounted to unjustified interference with Conserv's developing relationship with CVS, in turn potentially frustrating APG's contractual right to commissions. Several alleged facts, if ultimately believed by the jury, would support a finding that MCI knowingly stabbed Conserv (and APG) in the back at a time when the telecommunications company would have been expected to support its distributor's increasingly promising relationship: MCI's alleged failure to tell Conserv that it was separately pursuing CVS, which was atypical secrecy;[11]

---

[10] We agree with the magistrate judge that the first two elements of the contractual interference claim were sufficiently supported in the record. It is undisputed that APG signed two contracts with Conserv, and the record demonstrated adequate interaction between Isaacs - an MCI representative - and the Rices and Conserv to permit a jury to find that MCI must have been aware of APG's role in the CVS transaction. We think these elements are debatable on the prospective opportunity claim, but find it unnecessary to dwell on the issue in light of our conclusion that the claim otherwise fails.

[11] Lenhart, Isaacs' supervisor, indicated in his deposition that surreptitious, parallel activity by the direct sales department would be a departure from MCI's standard approach. He reported that MCI's practice was not to compete with its

Isaacs' email communication of valuable information obtained only because she was, on the surface, an advocate of the Conserv-CVS deal; and Richards' direct challenge to such a deal by discounting the quality of service CVS would receive from a distributor. In short, a jury might well have concluded that MCI unfairly utilized inside information and misrepresentation to secretly gain an advantage over an unsuspecting competitor who reasonably thought it was in a partnership. This strikes us as conduct that a jury could view as unjustified interference.[12]

---

distributors, but to figure out early on which path was most promising. Conserv's Vinci testified that he did not expect direct competition from MCI in light of Isaacs' participation in Conserv's negotiations: "I believe that it was told to us by MCI that once . . . you went on record that you were in on the account that others would back away." The record does contain contrary evidence, however. Isaacs testified that she saw no problem with both MCI and an MCI distributor such as Conserv submitting separate bids because "Conserv is a separate organization, not an agent of MCI's but a separate business entity." McGann offered a similar view in a portion of her deposition that was admitted at trial. She said the direct sales team was permitted to compete head-to-head with MCI distributors, noting that "that's inherent business practice . . . standard operating procedure in every part of the business . . . ."

[12] We note that intentional interference can be proven "even though it arose from good motives and without express malice," Jolicoeur Furn. Co. v. Baldelli, 653 A.2d 740, 753 (R.I. 1995) (citations omitted). On the other hand, "[c]onduct in furtherance of business competition is generally held to justify interference with others' contracts, so long as the conduct involves neither 'wrongful means' nor 'unlawful restraint of trade.'" Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I., 883 F.2d 1101, 1113 (1st Cir. 1989) (quoting Restatement (Second) of Torts §768 at 39 (1979)).

The difficulty for APG arises, however, when we canvas the record for evidence on the causation element. Under Rhode Island law, APG must prove either that "but for" MCI's interference, it would not have suffered injury, or that "it is reasonably probable that but for the interference" APG would not have been injured, Mesolella, 508 A.2d at 671; see also Ed Peters Jewelry Co., 51 F. Supp. 2d at 102; L.A. Ray Realty v. Town of Cumberland, 698 A.2d 202, 207 (R.I. 1997). APG therefore must prove that it is at least "reasonably probable" that CVS would have completed a deal to purchase prepaid phone cards through Conserv had MCI not interfered improperly in the bidding process. We construe this to be a high level of probability - at least more likely than not - given the "but for" starting point for the causation inquiry. In another context, the Rhode Island Supreme Court has ruled that such a likelihood depends on evidence that is "reasonably definite and is neither speculative nor remote," Palazzi v. State, 319 A.2d 658, 662 (R.I. 1974).

Although MCI highlights deposition testimony from both Foulkes and Jacobs stating that CVS never seriously considered choosing Conserv and APG for the contract, a jury certainly would be entitled to disbelieve that testimony. Jacobs' phone call to Vinci in mid-April 1997 to resume discussions with Conserv, the conversations reported by the Rice brothers in which Foulkes identified Conserv as one of the final contenders, and Jacobs'

inquiries about a test program and other details of the Conserv proposal all belie the assertion that Conserv was never a serious option.

But at the same time, there also is no evidence that Conserv was likely to win the contract. Indeed, Jacobs' unsolicited call to Richards in mid-May, in which she asked about doing business with a distributor, manifested concern about going down that path. Conserv and MCI were still discussing the details of a possible test program at that point, reflecting the preliminary nature of their dealings. The Rices were not told that Conserv was the leading contender for the contract, but only that the company was one of two or three possibilities under consideration at that time. Although the Rices' family connection with CVS president Goldstein apparently opened the door to Conserv in the bidding process, we have found nothing in the record to suggest that that personal relationship was giving Conserv an inside track on winning the bid.

Moreover, the record does not necessarily link, in time, MCI's submission of a proposal to CVS with Isaacs' April 25 email reporting Jacobs' call to Vinci, which was the correspondence that allegedly gave MCI its unfair entry into the competition. It was not until after Jacobs called Richards, nearly three weeks later, that MCI took concrete steps to submit a bid. That timing weakens the likelihood that unjustified interference by MCI caused Conserv to lose the contract. The sequence of events is more consistent

with the likelihood that CVS's desire to secure the best deal, rather than any affirmative conduct by MCI, led CVS to thoroughly investigate the proposals it had in hand, including Conserv's, and to look beyond them.

In short, the record evidence would support a finding that Conserv and APG had a real chance of being chosen to provide CVS with prepaid phone cards, but not a finding that that outcome was "reasonably definite." The undisputed facts, even taken in the light most favorable to APG, do not show a sufficiently developed or focused interest in Conserv to satisfy the causation element. While CVS was seriously interested in what Conserv could offer, the record does not establish that Conserv was unique in that respect; it therefore would be wholly speculative to find that MCI's entry into the competition caused a loss of commissions to APG. Cf., e.g., L.A. Ray Realty, 698 A.2d at 208 (plaintiffs' projects were in the final stage of the approval process when defendant's conduct interfered with their development plans); Mesolella, 508 A.2d at 670-71 (similar: plaintiff had obtained all preliminary approvals for building project before city's unlawful zoning change caused cancellation of real estate closing). Nor do we see any material factual disputes whose resolution could change that conclusion. Consequently, both tortious interference claims were properly dismissed on summary judgment.

2. Unjust enrichment. To establish a claim for unjust enrichment under Rhode Island law, a plaintiff must prove three elements: "'(1) a benefit must be conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof.'" Bouchard v. Price, 694 A.2d 670, 673 (R.I. 1997) (quoting Anthony Corrado, Inc. v. Menard & Co. Bldg. Contractors, 589 A.2d 1201, 1201-02 (R.I. 1991)); see also Commercial Assocs., 998 F.2d at 1100.

APG argues that a jury easily could find that it conferred a benefit on MCI through its contact with CVS president Goldstein and its resulting discussions with Jacobs and Foulkes, which stimulated CVS's interest in the MCI prepaid product. In addition, APG asserts that MCI's in-house staff "did little or nothing" to win the deal while APG devoted considerable effort, and a jury therefore could find that it would be inequitable not to award APG some commission.

The magistrate judge rejected unjust enrichment as a viable claim largely because of MCI's longstanding business relationship with CVS, noting that APG therefore could not claim to have brought the two companies together. In addition, the magistrate judge noted that MCI and CVS had discussed the possible sale of prepaid cards as early as August 1996 - well before Conserv and APG's

involvement. The magistrate judge found no possible inequity in MCI's consummation of the CVS contract "since CVS awarded MCI[] the prepaid phone card contract in the spirit of business competition with other vendors." MCI merely endorses the magistrate judge's statements, adding only that "APG had absolutely nothing to do with MCI's relationship with CVS, or with MCI's effort to obtain CVS's prepaid card business."

While we think the magistrate judge's assessment is one plausible reading of the record, we think the facts, viewed with all inferences in favor of APG, are not so conclusive. Nor is MCI's perspective on APG's role in the transaction, though understandable, commanded by the record. A different "but for" question is in play on this claim: even if Conserv and APG never would have gotten the deal on their own, would MCI's inside sales staff also have been out of the picture but for the distributors' involvement?

While MCI was engaged in a slow and seemingly unproductive pursuit of CVS's prepaid business, Conserv and APG were actively pursuing the account. Beginning with the January 1997 meeting with Jacobs, Conserv and APG focused CVS's attention on the benefits of the MCI card, and they were sufficiently compelling in their presentation for Jacobs to re-connect with them in April after a brief moratorium in the discussions. Conserv and APG provided MCI – through Isaacs – with information they previously did not possess

about what Jacobs was looking for and the other companies competing for the business, and the record would permit an inference that this knowledge helped Richards formulate his successful proposal in the two days he devoted to it.

Moreover, the record strongly suggests that MCI became aware of the immediacy of CVS's intent to purchase prepaid cards only because of Conserv and APG - from both the Jacobs phone call to Vinci (passed along by Isaacs) and her phone call three weeks later to Richards. The record at present raises the real possibility that MCI would have been out of the running for the CVS contract if Jacobs had not called Richards to ask about the quality of service available through MCI distributors - a conversation that apparently led to the last-minute proposal from MCI's in-house sales staff. The prospect of CVS making a decision without MCI in the mix was in Richards' mind: "Clearly this is distressing," he wrote in his May 14 email to McGann, "in that[] an account of this size appears to be moving ahead without us having had an opportunity to prepare a well constructed proposal."

On the facts developed to this point, therefore, we think a jury could conclude that Conserv and APG invested the time and effort needed to sell CVS on the MCI program, and that MCI then came along and collected the benefit without crediting Conserv and APG for their contribution. The evidence of record thus appears sufficient to allow a finding that all three elements of the unjust

enrichment claim were met: (1) a benefit (access to the CVS account) (2) of which the defendant was aware, and (3) that was accepted in circumstances in which failure to pay would be inequitable.

It may be, of course, that a jury would not find unjust enrichment, concluding, as did the magistrate judge, that what transpired was simply a matter of one competitor prevailing over another. But we think there is enough in the record to warrant a jury's determination on whether appellant conferred a benefit that MCI ought to pay for. Such an award would not necessarily lead to payment of commissions throughout the life of the CVS contract, but could, for example, be equivalent to a "finder's fee" reflecting equitable considerations, if the jury found that APG served as a catalyst for MCI's success. We therefore vacate the district court's grant of summary judgment on the unjust enrichment claim.

3. Misappropriation of Trade Secrets. Appellant asserts that the information contained in Cindy Isaacs' email message to Mary McGann on April 25 constituted protectable trade secrets that MCI unlawfully misappropriated in violation of the Uniform Trade Secrets Act. See R.I. Gen. Laws § 6-41-1. The magistrate judge concluded that the information at issue – including certain technical details concerning CVS's needs and the fact that Jacobs was urgently seeking answers to her questions – did not qualify as protected trade secrets.

We agree that the claim fails as a matter of law. The statute defines a trade secret, inter alia, as information that is "not . . . readily ascertainable by proper means by[] other persons who can obtain economic value from its disclosure or use." Id. at § 4(i). Although MCI did not previously have the information communicated by Isaacs, we agree with the magistrate judge that it was obtainable within normal business channels had MCI sought to do so. Indeed, Jacobs told Richards three weeks later that MCI would have to act quickly to get a proposal on the table, and certainly CVS would have provided MCI with the details of its technical requirements if asked.

Thus, the information at issue here does not constitute trade secrets. It may well have been knowledge that MCI originally obtained unfairly and then used to its advantage without properly compensating Conserv and APG, but that possibility is adequately and appropriately addressed within the context of the unjust enrichment claim. We therefore affirm the district court's grant of summary judgment on the misappropriation claim.

## III. Conclusion

For the reasons discussed above, we affirm the district court's grant of summary judgment for defendant MCI on the tortious interference and misappropriation of trade secrets claims, but remand for further proceedings on the unjust enrichment count. We

also affirm the court's judgment as a matter of law for defendant on the breach of contract claim.

Affirmed in part, vacated in part, and remanded. Appellant shall recover one-half its costs.